IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

Earnest Jones, III,

        Plaintiff,

vs.

Commissioner of Social Security,

        Defendant.

CASE NO. 1:23-cv-0636

MAGISTRATE JUDGE
James E. Grimes Jr.

**MEMORANDUM OPINION
AND ORDER**

Plaintiff Earnest Jones, III filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 12. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural background**

In June 2019, Jones filed an application for disability insurance benefits alleging a disability onset date of June 14, 2019.[1] Tr. 235–41. In pertinent part, Jones claimed that he was disabled due to "epilepsy with seizures only when sleeping" as well as several other illnesses, injuries, and

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

conditions. Tr. 79. He listed his last insured date as March 31, 2023.[2] The Commissioner denied Jones's application at the initial level and upon reconsideration. Tr. 95–105, 106–16. In June 2020, Jones requested a hearing before an Administrative Law Judge (ALJ). Tr. 136–37. In January 2021, ALJ William Leland held a hearing at which Jones and vocational expert Suman Srinivasan testified. *See* Tr. 52–78. Two weeks later, ALJ Leland issued a written decision finding that Jones was disabled due to limitations caused by epilepsy and depression. Tr. 107–16; *see also* Tr. 119. ALJ Leland found, in pertinent part, that Jones had the physical residual functional capacity (RFC)[3] to perform work at all exertional levels with additional limitations and the mental RFC to perform simple work with no more than occasional interaction with coworkers and supervisors and no interaction with the public. Tr. 111. ALJ Leland made an additional finding that, in

---

[2]     To be entitled to disability insurance benefits, a claimant must establish that he or she is a wage-earner who accumulated sufficient earning credits and became disabled before the date on which he or she was last insured. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Soc. Sec. Disab. Claims Prac. & Proc.* § 5:3 (2nd ed. 2022). Jones was last insured on March 31, 2023, so to demonstrate eligibility, he needed to establish disability before that date. *See* Tr. 79. Accordingly, the relevant time period runs from June 14, 2019, Jones's alleged disability onset date, through March 31, 2023, when he was last insured. *See* Tr. 79–80.

[3]     An RFC is an "assessment of" a claimant's ability to work, taking his or his "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

addition to normal work breaks, Jones would be off task 20 percent of the day and absent from work two days per month. *Id*.

In March 2021, the Appeals Council notified Jones that it would be reviewing ALJ Leland's hearing decision. *See* Tr. 119, 183; *see also* 20 C.F.R. § 404.969(a) ("Anytime within 60 days after the date of a decision …, the Appeals Council may decide on its own motion to review the action that was taken in your case"). In June 2021, the Appeals Council issued a written decision vacating the ALJ's decision and remanding the case. Tr. 117–24. The Appeals Council found that ALJ Leland had committed reversible error and that substantial evidence did not support his assessment of Jones's maximum RFC. *See* Tr. 119 (citing 20 C.F.R. § 404.970).

The Appeals Council directed that on remand, ALJ would "offer the claimant an opportunity for a hearing, take any further action needed to complete the administrative record[,] and issue a new decision" in accord with the following directives:

- Obtain additional evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512 and Social Security Ruling 17-4p). The additional evidence may include, if warranted and available, a consultative examination and medical source opinions about what the claimant can still do despite the impairment.

- If available, obtain evidence from a medical expert, preferably a neurologist, related to the nature and severity of and functional

3

limitations resulting from the claimant's impairment, including whether the impairment meets or equals a listing impairment (20 CFR 404.1513a(b)(2)).

- Further evaluate the claimant's alleged symptoms and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms (20 CFR 404.1529).

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the medical source opinion(s) and prior administrative medical findings pursuant to the provisions of 20 CFR 404.1520c. As appropriate, the Administrative Law Judge may request the medical source provide additional evidence and/or further clarification of the opinion (20 CFR 404.1520b).

- Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/ limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

Tr. 121–22.

4

In October 2021, ALJ Timothy G. Keller held a hearing on remand at which Jones and vocational expert Rebecca Kendrick testified. Tr. 36–51. ALJ Keller issued a written decision in November 2021 finding that Jones was not disabled. Tr. 12–35. ALJ Keller's decision became final in January 2023, when the Appeals Council declined further review. Tr. 1–6; *see* 20 C.F.R. § 404.981.

Jones filed this action in March 2023. Doc. 1. In it, he asserts the following assignments of error:

1. The ALJ failed to identify substantial evidence supporting the step 3 finding, failed to consider reasonable justifications for missing medication doses, and failed to properly develop the record.

2. The ALJ failed to identify substantial evidence supporting the residual functional capacity finding.

Doc. 9, at 1.

**Factual background**

*1. Personal and vocational evidence*

Jones was born in 1967 and was 51 years old on the alleged disability onset date. Tr. 287. He has a GED. Tr. 300. Jones previously worked insulating agricultural trailers, conducting merchandise inventories, and operating a molding machine at an electronic parts factory. *See* Tr. 41–44, 300, 317.

2. *Medical and evidence*[4]

*Seizure-related treatment.* In May 2018, Jones established care with neurologist Robert T. Woodruff, M.D., for generalized tonic-clonic seizures.[5] *See* Tr. 966. In the year before his alleged disability onset date, Jones was hospitalized 10 times for seizure activity.[6] *See* Doc. 9, at 4 (citing Tr. 540–614, 801–05, 816–22, 836–62, 963–1004, 1061–1183). Dr. Woodruff initially prescribed the antiseizure medication Keppra. *See* Tr. 968. Jones's seizures continued and after six months, Dr. Woodruff replaced Keppra with Lamictal.[7] *See* Tr. 968, 972. In addition to seizures, Jones was diagnosed with, pertinently, obstructive sleep apnea, post-traumatic stress disorder

---

[4]    This recitation of medical evidence is not intended to be exhaustive. The discussion of the evidence is limited to the evidence cited by the parties in their briefs and any additional evidence necessary to provide context.

[5]    Generalized tonic-clonic seizures are characterized by "a loss of consciousness … [with] a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions)." 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.00H(1)(a).

[6]    It's not clear when Jones's seizures began. He has said that he first experienced seizure activity after he was assaulted in May 2017. Tr. 3114, 3227. Jones also reported that his seizures or "clinical activity" started in 2015. *See* Tr. 1288, 1307, 1317. On another occasion, he said that he was first diagnosed with epilepsy in May 2019. Tr. 1304. He also indicated that his seizures began in May 2018. Tr. 966.

[7]    Lamictal is one of two major brand names for the antiseizure medication lamotrigine. *See Lamotrigine Tablets*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/drugs/20217-lamotrigine-tablets [https://perma.cc/Z2FY-5Y3A]. In the record, Lamictal and lamotrigine are used interchangeably. Here, I refer to this medication as Lamictal to avoid confusion.

(PTSD), major depressive disorder, generalized anxiety disorder, and mood issues. *See* Tr. 1335, 1850, 1873.

In May 2019, a few weeks before Jones's alleged disability onset date, he was admitted to Mansfield Hospital due to seizure activity. Tr. 963–1004. He reported not taking his Lamictal over the weekend "likely due to lab."[8] Tr. 972. Jones's wife[9] spoke to the emergency department physician, Ahmed Mohamed Ayed Eid, M.D., and explained that Jones hadn't taken his Lamictal because he vomited during the day and was nauseated. *Id.* A CT scan of Jones's brain was unremarkable. Tr. 963. Dr. Eid contacted the neurology department and Gubert Lee Tan, M.D., responded to consult. Tr. 963, 966.

Dr. Tan reviewed Jones's history and observed that Jones had a Lamictal level of 3.3 micrograms per milliliter[10] in January 2019. Tr. 968. Dr. Tan noted that Jones "mentioned occasionally forgetting the dose" of his Lamictal, which was 100 milligrams twice daily. Tr. 966. Dr. Tan indicated that Jones's compliance was "unclear" because "sometimes Jones missed his

---

[8]    It's not clear what *lab* means in this context.

[9]    The record contains no other reference to Jones being married but does refer frequently to Jones's live-in girlfriend, who appears to be the same individual as the "wife" here. *See, e.g.,* Tr. 41, 717, 1297, 3005.

[10]    A Lamictal level of 3.3 micrograms per milliliter is low but within the reference range for seizure control of between 3 and 14 or 15 micrograms per milliliter. *See* Tr. 1367; *see also Lamotrigine (Lamictal) Drug Level*, Laboratory Services Handbook, University of Iowa Department of Pathology, https://www.healthcare.uiowa.edu/path_handbook/handbook/test13.html [https://perma.cc/CP2P-2SWM].

medication." Tr. 968. Dr. Tan increased Lamictal to 125 milligrams twice daily and advised Jones to follow-up with Dr. Woodruff. *See* Tr. 972.

Jones saw Dr. Woodruff in June. Tr. 1236. Jones reported that he had not taken his nighttime dose of Lamictal before his seizures in May. *Id*. His seizure activity used to involve no more than staring spells, however, Jones reported that he had started convulsing during seizures. *Id*. Dr. Woodruff found that Jones was depressed, withdrawn, and scared. *See* Tr. 1236, 1238. He looked unwell and overwhelmed. Tr. 1238. Jones nonetheless had a normal gait and neurological examination with normal speech, judgment, memory, cognition, thought content, strength, and coordination. *Id*. Dr. Woodruff increased Lamictal to 100 milligrams in the morning and 200 milligrams at night. *See* Tr. 1239.

Jones arrived at the Mansfield Hospital emergency department less than a week later complaining of seizure activity that happened while he was sleeping. Tr. 631. The treatment team noted that Jones "claimed" to be medication compliant. *Id*. Once his postictal[11] symptoms resolved, Jones

---

[11]   The period of brain recovery time after a seizure until a patient returns to baseline is called the postictal phase with "ictal" meaning the actual seizure. *See* Reza Shouri, M.D., The Postictal Phase of a Seizure, Verywell Health, https://www.verywellhealth.com/postictal-seizure-phase-1204459 [https://perma.cc/ZV66-PC6L]. In a postictal state, a patient may experience mental symptoms including exhaustion, confusion, fear, anxiety, agitation, frustration, embarrassment or shame, memory loss, or depression. *Id*. He or she may also experience physical symptoms such as migraine or headache, loss of bladder or bowel control, nausea or upset stomach, weakness, faintness, or muscle soreness. *Id*.

signed himself out of the hospital against medical advice. *See* Tr. 634–35, 646.

Jones returned a few hours later and reported that he had two more seizures at home. Tr. 633–34. He had another seizure—his fourth in as many hours—in the emergency room. Tr. 633. Treating physician Michael Elias, M.D., found that Jones, who was postictal, had status epilepticus[12] and severe metabolic acidosis "probably sec[ondary] to lactic acidosis from seizure." Tr. 632. Jones reported "likely miss[ing] 2 doses [of Lamictal]" while he was "busy helping his son." Tr. 646. Dr. Elias ordered Jones admitted to the intensive care unit and administered 125 milligrams of Lamictal as well as Ativan and valproic acid intravenously. Tr. 635, 646. Jones's condition "improved significantly within 24 hours." *Id*. Dr. Tan also evaluated Jones. *See* Tr. 634–36. He recorded that Jones "claimed to be complaint with his medication." Tr. 634. Jones's Lamictal level was 4.2 milligrams per milliliter. *Id*. His care team expressed surprise that Jones's Lamictal level was "within [the] reference limit." *See* Tr. 646.

Mansfield Hospital admitted Jones for seizure activity in July and August 2019. Tr. 674–703. During both stays, Jones said that he was

---

[12]    Status epilepticus is when a seizure lasts more than five minutes or when seizures occur close in time to one another without the patient recovering consciousness in between. https://www.epilepsy.com/complications-risks/emergencies/status-epilepticus. *See Status Epilepticus*, The Epilepsy Foundation, Seizure Emergencies, https://www.epilepsy.com/complications-risks/emergencies/status-epilepticus [https://perma.cc/7MRZ-EA9J].

medication compliant. Tr. 678, 705. After Jones's July seizures, Dr. Woodruff increased Lamictal to 200 milligrams in the morning and 300 milligrams at night. *See* Tr. 677, 1226, 1233.

In September 2019, Mansfield Hospital admitted Jones for seizure activity. Tr. 712–65. Jones's girlfriend reported witnessing him have two seizures at home. Tr. 717. He had a third seizure in the  emergency room before being admitted. *Id*. Cardiologist James M. Koch, M.D., recorded Jones's noncompliance with Diltiazem.[13] Tr. 716. He also noted Jones's noncompliance with his medication under the "[p]lan per neurology." *Id*. Neurologist Suraj Rajan, M.D., arrived to assess Jones and to develop a discharge plan. Tr. 717–18. Dr. Rajan reviewed with Jones that he had needed emergency care as an admitted patient at Mansfield Hospital monthly for seizure activity since June. Tr. 717. Dr. Rajan noted that Jones's seizures were "mostly associated" with missing doses of Lamictal. *Id*. He pointed out that Jones had "[a]dmitted … missing evening doses [of Lamictal] in the past several days." *Id*. Dr. Rajan emphasized the fact that Jones "[f]requently misse[d] [his] nighttime dose" and advised him to discuss ways to improve compliance with Dr. Woodruff. *Id*. Dr. Rajan also suggested strategies Jones could use to help "surmount his compliance issues." *Id*.

---

[13]     Diltiazem is a blood pressure medication. *See Diltiazem,* MedicineNet, https://www.medicinenet.com/diltiazem/article.htm     [https://perma.cc/R3BA-DTB8].

Jones saw Dr. Woodruff about two weeks later. Tr. 1226–30. He was prescribed 200 milligrams of Lamictal in the morning and 300 milligrams at night, however, Jones reported that he'd only been taking 100 milligrams in the morning. Tr. 1226. Dr. Woodruff noted that Jones was dealing with "severe mood disorder" and post-traumatic stress disorder in addition to the seizures. *Id*. He found that Jones wasn't agitated or confused and didn't have behavioral problems, decreased concentration, hallucinations, self-injury, sleep disturbance, or suicidal ideation, though Jones's mood was dysphoric.[14] Tr. 1227. He did not appear to be ill or in any distress. Tr. 1228. Although Jones was withdrawn and tearful, his speech, judgment, and thought content were normal. *Id*. He was alert and oriented to person, place, and time. *Id*. He had a normal gait with normal strength, muscle tone, and coordination. *Id*.

In October 2019, Jones arrived at Mansfield Hospital late in the evening complaining of seizure activity. Tr. 793. He arrived in a postictal state and had a seizure in the emergency room before he was admitted to the hospital. Tr. 788, 793. Jones said that he "may have missed a few doses of his Lamictal" but also reported medication compliance and expressed frustration that he was still having seizures. Tr. 786, 788. His labs were unremarkable. *Id*. Certified Nurse Practitioner (CNP) Beth Ashley Seymour noted that Jones frequently missed his evening Lamictal doses. *Id*. She observed that Jones had no further seizure activity after he was given Lamictal and Keppra

---

[14]     A dysphoric mood is disquiet, restlessness, or malaise. *See* Dorland's Illustrated Medical Dictionary 573 (33rd ed. 2020).

in the hospital. *Id*. In the early morning hours of the next day, Jones asked to be discharged but Seymour advised Jones to stay to be assessed by someone from neurology. *See* Tr. 792. Jones left against medical advice. Tr. 792–93.

In November 2019, the Mansfield Hospital emergency staff treated Jones. Tr. 1297. The night before, Jones's girlfriend witnessed Jones having a seizure in his sleep and called emergency services. *Id*. After Jones arrived at the hospital but before he was admitted, he had a second seizure. *Id*. At the recommendation of the neurology department, Mansfield Hospital transported Jones to Riverside Methodist Hospital for ongoing evaluation in a specialized epilepsy monitoring unit. *See* Tr. 1297, 1300, 1333.

At Riverside, Jones reported "complete compliance" with his Lamictal as prescribed. Tr. 1302. Brooklyn Elaine Hill, CNP, found that Jones's level of Lamictal was "low normal" and "suspect[ed] nonadherence." Tr. 1302. Jones experienced no further seizure activity at Riverside and had a normal neurological exam. Tr. 1300. Riverside neurologist Emily Terese Klatte, M.D., assessed Jones. Tr. 1300; Tr. 1306. Dr. Klatte noted that he "never had a seizure while awake." Tr. 1304. She recited Jones's Lamictal dosages—200 milligrams of in the morning and 300 milligrams at bedtime—and found that his assertion of complete compliance was contradicted by "documentation from OLH."[15] Tr. 1305. Dr. Klatte ordered long-term EEG testing.[16] Tr. 1304.

---

[15]     It's not clear what Dr. Klatte meant by *OLH*.

She indicated that she might ease Jones's driving restriction since his events were strictly nocturnal. Tr. 1304.

Later that day, Jones underwent the testing that Dr. Klatte ordered. Tr. 1313–14. For 17 hours, an EEG continuously monitored and recorded Jones's neurological activity. *Id*. The study did not detect or observe any seizure activity or find any diagnostic markers showing epilepsy. Tr. 1313. Jones's results were normal as was the "[b]ackground activity" of his brain. Tr. 1314. Galen Benedict Hayek, D.O., authorized Jones's discharge. Tr. 1320–22. Dr. Hayek noted that Jones had been admitted for seizures "due to probable med non-compliance." Tr. 1321.

In mid-December 2019, Jones had a follow-up with his pulmonologist, Robert Denton, M.D., for obstructive sleep apnea. Tr. 1850–65. Jones had been using a CPAP machine for his sleep apnea and reported that it "ma[de] a difference."[17] Tr. 1850–65. Dr. Denton found Jones alert, well-oriented, cooperative, and in no apparent acute distress. Tr. 1850. His head, neck, chest, abdomen, and extremities were normal. *Id*. Jones had a normal

---

[16]    Electroencephalography (EEG) is the primary diagnostic test for brain function. *See* David Y. Ko, M.D., *Epileptiform Discharges*, Medscape Drugs & Diseases,  https://emedicine.medscape.com/article/1138880-overview?form=fpf [https://perma.cc/HCA7-2KMV]. EEG continuously measures brain function and allows for greater detection of interictal—between seizure—electrical brain activity. *Id*.

[17]    A CPAP (continuous positive airway pressure) machine is a common treatment for sleep apnea. It keeps the airways open during sleep ensuring that one's body receives oxygen. *See CPAP Machine*, Cleveland Clinic Health Library,  https://my.clevelandclinic.org/health/treatments/22043-cpap-machine [https://perma.cc/H27A-GXZR].

neurological exam during which Dr. Denton found no obvious focal abnormalities. *Id*.

Jones returned to Riverside's Epilepsy Monitoring Unit a week later to undergo additional testing. *See* Tr. 1333–72. Since the previous "nondiagnostic" long-term EEG study had not captured any seizure spells, Dr. Klatte suggested that additional monitoring might capture Jones's "spells of unclear etiology" so she could classify and investigate them. *See* Tr. 1335, 1347. When Jones arrived, he had a Lamictal level of 7.9 micrograms per milliliter, which is within the therapeutic range for seizure prevention. Tr. 1367.

Dr. Klatte recited Jones's "various medical problems including post-traumatic stress disorder, possible epilepsy versus nonepileptic spells, hyperlipidemia, sleep apnea, and kidney disease." Tr. 1335. Jones "believe[d] he was still having fairly frequent seizures[,] … the majority … occur[ing] during sleep." *Id*. Jones was still "struggle[ing] with mood issues." *Id*. He was alert and oriented with fluent speech and language, a reactive affect, symmetrical movement in all extremities, normal coordination, and a steady gait. *Id*.

The second long-term EEG showed normal sleep activity and didn't capture any clinical events. Tr. 1348. The interictal recordings showed

"occasional sharp transients[18] with a benign morphology" in Jones's left temporal region. *Id*. The presence of transients suggested that Jones's brain was able to generate seizures. *See* Tr. 1364. According to Dr. Klatte, this could suggest a predisposition to focal onset seizures,[19] but the study hadn't captured any of his "clinical events" so it wasn't clear whether Jones's seizures were epileptic or nonepileptic in nature.   Tr. 1348. Dr. Klatte discharged Jones with instructions to keep taking Lamictal, refrain from driving, and follow-up with Dr. Woodruff. Tr. 1362–64. She recommended ongoing treatment for sleep issues, stress, and PTSD because improving these issues would also help with his seizures. *Id*.

About two weeks later, in January 2020, Jones arrived at Mansfield Hospital in a postictal state seeking emergency treatment due to seizure activity. *See* Tr. 1773; *see also* Tr. 1772–1802, 1960–94. He had a second seizure in the hospital and reported poor sleep and significant stress. Tr. 1794. Dr. Rajan treated Jones and noted that "there [was] a question of

---

[18]    Dr. Klatte described Jones's transients as "sharp waves ('or sparks')." Tr. 1364. *See also* David Y. Ko, M.D., *Epileptiform Discharges*, Medscape Drugs & Diseases, https://emedicine.medscape.com/article/1138880-overview?form=fpf [https://perma.cc/HCA7-2KMV](defining sharp transients as spiky electrical discharges).

[19]    Focal onset—as opposed to generalized—seizures begin in one side of the brain. https://www.epilepsy.com/what-is-epilepsy/seizure-types/focal-onset-aware-seizures [https://perma.cc/R4EV-BQ3E]. Focal onset aware seizures, where one doesn't lose awareness of his or her surroundings, are the most common type of seizure experienced by people with epilepsy. *Id*.

whether … [Jones had] additional function nonepileptic seizures on top of his epileptic seizures." *Id*.

Jones saw his primary care provider, physician's assistant Charles O. Davis, the following week. *See* Tr. 1806–08. Davis noted that it wasn't clear whether Jones's seizures were due to neurological issues or stress and mental health. Tr. 1806. Davis recorded that in addition to seizures, Jones was reporting anxiety and depression. *Id*. Davis found that Jones was emotional, sad, and stressed. *Id*. He had a depressed mood and no interest in hobbies and a lack of motivation and energy. *Id*. Despite taking Paxil daily, Jones's symptoms had not improved. *Id*. Davis increased Jones's Paxil dose. *Id*.

In early February 2020, Jones arrived at Mansfield Hospital complaining of seizures and dizziness. Tr. 1918–59, 2155. He said that he felt extremely tired, lightheaded, and nauseated. Tr. 1918. He had low blood pressure. Tr. 1918, 1924. Jones's treating physician suspected that Jones had a syncopal[20] episode rather than a seizure. Tr. 1924.

In March, Mansfield Hospital's emergency department staff treated Jones for seizures. Tr. 1996–2154, 2254–2315. He had been at home when he experienced a two-minute seizure. Tr. 2126. Jones was discharged but returned later the same day and reported experiencing another seizure at home. Tr. 2258. In the emergency department before he was admitted for the

---

[20]    Also called fainting, syncope is the medical term for a temporary suspension or loss of consciousness. *See* Dorland's Illustrated Medical Dictionary 1788 (33rd ed. 2020).

second time, Jones had a generalized seizure that involved drooling and foaming in the mouth. Tr. 2267. The emergency department staff intubated him to protect his airway, sedated him, and placed him on a ventilator. *Id.* Jones admitted using drugs but "would not give the details of what drugs he was using." *Id.* He had an unremarkable CT scan that did not detect any acute abnormality. *Id.* Dr. Tan reviewed Jones's EEG results and found them unremarkable. Tr. 2303. After two days of treatment, Dr. Tan authorized Jones's discharge. *Id.* He increased Jones's dose of Lamictal and prescribed Vimpat.[21] *Id.*

Later that month, Jones transferred neurological care to Dr. Tan, with whom he had a follow-up telehealth appointment. Tr. 2752–57. Dr. Tan recited Jones's history of PTSD and cocaine and marijuana use. Tr. 2753. He noted that Jones was having seizures every several months and that most were nocturnal or during the transition between sleeping and waking. *Id.* "Occasionally," Dr. Tan found, Jones's stress "caused him to have a breakthrough seizure." *Id.*

After March 2020, Jones was next hospitalized for seizures in June. Tr. 2165. He reported that he "recently stopped taking Keppra due to a reaction he was having." Tr. 2165. He was "otherwise feeling well [and] denie[d] missing any other medications." *Id.* His Lamictal level was 4.8 milliliters per microgram. Tr. 2379.

---

[21]    For financial reasons, Jones discontinued Vimpat. *See* Tr. 2747.

Jones received emergency medical treatment for seizures in July, September, October, and November 2020. *See* Tr. 2165, 2365, 2558–59, 2590, 2649, 2699. He reported medication compliance during those hospital visits. Tr. 2367, 2559, 2649. In July, Jones had two seizures which brought him to the hospital and then a third seizure just as he was about to be discharged. Tr. 2372–73. His Lamictal level in July was 3.9 milliliters per microgram. *See* Tr. 2558. Thereafter, Jones began taking Trileptal in addition to Lamictal. *See* Tr. 2389.

In September 2020, Jones had two seizures at home and was admitted to Mansfield Hospital. Tr. 2553. 2316–64, 2551–88. He was discharged but readmitted after having a third seizure while waiting for a ride. Tr. 2747, 2554. After three days of in-patient treatment, Hani Al Sali Al Krad, M.D., authorized Jones's discharge and increased Jones's dosages of Lamictal and Trileptal. Tr. 2566–67.

In October 2020, Jones saw Dr. Tan for a follow-up. Tr. 2745–52. Dr. Tan instructed Jones to avoid triggers including alcohol and to maintain regular sleep and dietary habits. Tr. 2748. Later that same day, Jones arrived at Mansfield Hospital for emergency medical treatment due to seizure. *See* Tr. 2746, 2521. He arrived in a postictal state and reported shaking for four minutes. Tr. 2522, 2527. Jones said that he was taking his medications as prescribed. Tr. 2522. He was observed then sent home. Tr. 2685. Within 20 minutes, Jones returned and reported having experienced

18

another seizure. Tr. 2685, 2692; *see also* Tr. 2466–2550, 2683–2744. Jones was admitted in the early hours of the next day for observation and neurologic consultation. Tr. 2685. Despite initially indicating he had been compliant with his medications, Jones later admitted missing doses of his seizure medications "at times because he [] often ma[de] trips to help family and forg[ot] his evening doses." Tr. 2699.

In November, primary care provider Davis found that Jones had an anxious mood. Tr. 1891. Jones said he was drowsy and didn't feel like himself when he was taking his most recently increased dose of Lamictal as well as a new medication, Oxcarbazepine. *Id*. Three days later, Jones was treated at Mansfield Hospital for seizure activity. Tr. 2644–82. His girlfriend observed him have three seizures overnight and called emergency services. Tr. 2649. Jones reported that he had taken his medications—250 milligrams of Lamictal in the morning, 300 milligrams of Lamictal at night, and 300 milligrams of Trileptal twice daily—the night before but not in the morning. *Id*. He reported being compliant with his current medication regimen. *Id*.

Jones next had a seizure in March 2021 and he was admitted to Mansfield Hospital. Tr. 2849, 2861. The following day, Dr. Tan found that Jones was awake, alert, bright, and interactive. *Id*. He had no appetite but also no headache, nausea, vomiting, angina, dyspnea, focal motor weakness, or numbness. *Id*. Jones "claimed" to have missed three to four days of anticonvulsant medications. *Id*. Dr. Tan noted that Jones had not had any

19

recurrent seizures since being treated in the hospital. *Id*. Long-term EEG monitoring showed normal wakefulness and sleep. Tr. 3243. "No clinical events were captured" and the recordings did not show any epileptiform discharges or ictal activity. *Id*.

In April 2021, Jones had a Lamictal level of 5.6 milligrams per microgram. Tr. 3004.

In May 2021, Jones was admitted to Mansfield Hospital for seizures. Tr. 3369–3441. He reported that his doctors had recently decreased his antiseizure medications and he had been compliant with the new dosages. Tr. 3376. He denied using any drugs or alcohol. *Id*.

In June, Jones was admitted to Mansfield Hospital after having three seizures. Tr. 2989. He reported that he "wasn't sure whether he had taken his medications." Tr. 2989, 2997.

In July, Jones was admitted to Mansfield Hospital for two seizures he reported experiencing in the morning Tr. 3101, 3094–3206. Jones had a third seizure in the emergency department while he waited to be admitted. Tr. 3110.  Jones said that he hadn't missed any doses of Lamictal and wasn't sure what triggered his seizures. *Id*. Dr. Rajan noted that Jones appeared visibly confused and "foggy." *Id*. He observed that this hospitalization marked Jones's tenth admission for seizure within the previous 18 months. Tr. 3113. Dr. Rajan noted that there was no clear etiology for the seizures other than Jones's self-reported "history of traumatic brain injury from a past assault."

Tr. 3113. He noted that previous treatment providers had assumed that noncompliance, not a cognitive issue, caused Jones's seizures. Tr. 3114. Before July, Jones's most recent spell had been in early May. *Id*. Although Jones's Lamictal level was in the therapeutic range, Dr. Rajan wasn't sure that this level of Lamictal was "efficacious enough." Tr. 3116. Dr. Rajan prescribed a new medication, extended release capsules of Dilantin. *Id*. He noted that Jones had a "baseline normal" neurological exam, a normal motor and sensory exam, and no focal deficits. Tr. 3115, 3118.

Jones was treated at Mansfield Hospital for seizures in August 2021. Tr. 3207–3347. Test results showed low levels of his antiseizure medications. Tr. 3225, 3243. Dr. Rajan observed Jones's dysphoric mood and noted that Jones reported sleep disturbance, anxiety, and PTSD symptoms. Tr. 3004. Jones said that his girlfriend had been preparing and administering his medications. Tr. 3005. He said he was dealing with a lot of stress. Tr. 3229. Dr. Rajan increased the twice daily doses of Lamictal. Tr. 3242.

*Other mental health treatment*. Starting in March 2020, Jones received mental health treatment at Third Street Family Health Services. *See* Tr. 1866–88. Carlos Molina Arriloa, M.D., listed Jones's diagnoses as post-traumatic stress disorder, generalized anxiety disorder, major depressive disorder, and marijuana use. *See* Tr. 1873. Jones also had impulse control issues, mood swings, and emotional instability. *Id*. He reported a history of physical and emotional abuse and a family history of violence. Tr. 1867. He

reported trauma stemming from his father's murder when Jones was a senior in high school. *Id*. Jones also discussed an incident during which he shot a man who had entered his home, for which he served several months in jail. *Id*. He reported feeling hypervigilant, experiencing flashbacks, isolating himself, and often being consumed by this event. Tr. 1867–68. Jones had "kind of [a] down mood." Tr. 1887. His insight and judgment were fair. *Id*.

In June 2020, Jones reported being more depressed and often angry with an "up and down mood." Tr. 1875. Christina E. Stout, CNP, found that Jones had anhedonia and determined that he had a loss of motivation, trouble sleeping, trouble concentrating, irritability, feelings of restlessness, crying spells nearly daily or daily, suicidal or homicidal thoughts, and short-term memory loss. Tr. 1875–76. Jones's behavior, speech pitch and volume, thought process, and thought content were normal. Tr. 1876. His insight and judgment were fair. *Id*. Jones had a calm affect and appeared depressed. *Id*.

In July 2020, Jones reported waking up in a negative mood and said he hadn't wanted to attend his appointment with Third Street counselor Jamie Pelfrey. Tr. 1871. Jones reported feeling depressed and irritable. *Id*.

In October 2020, Jones told social worker Ashley Risner at Third Street that he hadn't been sleeping well and felt "very depressed and constantly anxious." Tr. 1866. Jones reported that he was supposed to have a psychiatric follow-up with Dr. Molina but "'waited for over an hour,'" became frustrated, and left. *Id*. He said he felt like his medication wasn't working

and expressed his intention to transfer psychiatric care to another doctor. *Id*. Risner found Jones well-groomed and appropriately dressed. *Id*. She observed that he had a pleasant and cooperative demeanor and fair eye contact, though he "had a flat affect and appeared to be depressed." Tr. 1866.

In August 2021, Jones arrived at Mansfield Hospital seeking treatment for a panic attack. Tr. 3325–47. He appeared to be tearful and reported that his brother had died the night before from a heart attack. Tr. 3330–33.

### 3. *State agency and other medical opinion evidence*[22]

In January 2021, consultative psychological examiner Sudhir Dubey Ph.D., examined Jones. *See* Tr. 1288–95. Dr. Dubey found that Jones did not need simple directions. Tr. 1291. He found that Jones appeared to understand the questions Dr. Dubey asked and didn't need questions repeated. *Id*. Jones reported the ability to independently perform his own activities of daily living, complete his own paperwork, and shop for himself in stores. *Id*. Dr. opined on Jones's psychological capabilities as further discussed below.

---

[22]  When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

In October 2019, initial state agency consulting physician Bradley J. Lewis, M.D., reviewed the medical evidence and found that Jones had several severe impairments including epilepsy, neurocognitive disorders, and depressive, bipolar, and related disorders. Tr. 85. Dr. Lewis also found several nonsevere impairments including essential hypertension and substance addiction to drugs and alcohol. *Id.* Dr. Lewis indicated that he considered Listing 11.02 for epilepsy. Tr. 87. He found that Jones was capable of work at any level of exertion because Jones had "nonexertional limitations only." Tr. 93.

During reconsideration in April 2020, state agency consulting physician Leon Hughes, M.D., reviewed the medical evidence and adopted Dr. Lewis's findings. Tr. 96–105.

In December 2019, state agency consulting psychologist Darrell Snyder, Ph.D., reviewed the medical evidence and found that Jones had no more than moderate understanding and memory limitations, sustained concentration and persistence limitations, social interaction limitations, and adaptation limitations. Tr. 90–92. Dr. Snyder found that Jones was moderately limited in the ability to understand and remember detailed instructions. Tr. 90. Dr. Snyder further found that Jones was moderately limited in the ability to carry out detailed instructions. Tr. 91. Jones was moderately limited in the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to

24

perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 91. Dr. Snyder also found Jones moderately limited in the ability to interact appropriately with the general public and to respond appropriately to changes in the work setting. Tr. 91–92. Jones was not significantly limited in any other work activities. *See* Tr. 90–92.

In April 2020, state agency consulting psychologist Karla Delcour, Ph.D., reviewed the medical evidence and adopted Dr. Snyder's findings.

### 4. *Testimonial evidence*

Jones and a vocational expert testified during the hearing in October 2021. Tr. 36–51. Jones was represented by attorney David Dick, who submitted two pre-hearing briefs advocating that the ALJ find Jones disabled. *See* Tr. 384–89; 405–409.

Jones testified that he was still having seizures despite taking 400 milligrams of Lamictal twice daily. Tr. 40–41. His seizure medication dosage was increased three months ago and Jones had a seizure as recently as 17 days before the hearing. Tr. 41. Jones typically experienced seizures while sleeping. *Id*. His girlfriend usually observed the seizure activity and took him to the emergency room. *Id*. In 2021, Jones estimated that he experienced "[m]aybe ten, 15" seizures. Tr. 41. September was the only month that year in which Jones said he did not experience seizure activity. *Id*. He dislocated his shoulder in the course of a seizure and was attending therapy for his rotator cuff. Tr. 42. He reinjured his shoulder during his most recent seizure. *Id*. On

Dr. Tan's recommendation, Jones stopped driving in March 2021 due to his seizures. Tr. 45. In addition to his seizures, Jones had post-traumatic stress disorder and that affected his sleep and social life. Tr. 44.

After Jones, vocational expert Rebecca Kendrick testified. Tr. 45–50. Kendrick testified that a hypothetical individual Jones's age with the same level of education, work experience, and limitations as assessed in Jones's RFC, described below, would not be able to perform Jones's past work. Tr. 48–49. Such an individual could, however, perform unskilled labor with a medium level of exertion such as a kitchen helper, linen room attendant, or cook helper. Tr. 49. Being absent more than once a month on an ongoing basis would preclude such an individual from all work. Tr. 50.

**The ALJ's decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2024.

2. The claimant has not engaged in substantial gainful activity since June 14, 2019, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: obesity, bilateral carpal tunnel syndrome, status post left carpal tunnel release; and bilateral knee osteoarthritis, status post left knee surgery (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,

Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant cannot climb ladders, ropes, or scaffolds; cannot do commercial driving; cannot work around moving machinery or unprotected heights; is limited to simple, repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions with few if any workplace changes; and is capable of brief interactions with supervisors and coworkers sufficient to learn the unskilled job, adapt to changes as stated, and exchange appropriate work information, but with no public contact.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born [in] July … 1967 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, age, education, work experience, and residual functional

capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

Tr. 17–27.

### Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age,

> education, and work experience? If so, the claimant
> is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

29

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

**Discussion**

1. *Challenging the ALJ's step three finding that Jones did not meet or medically equal Listing 11.02 for epilepsy*

ALJ Keller found that epilepsy was one of several medically determinable severe impairments. Tr. 17–18. At step three, however, the ALJ determined that Jones's neurological impairments did not meet or medically equal Listing 11.02 for epilepsy.[23] *See* Tr. 19. The ALJ based this finding

---

[23]    The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *See id*; 20 C.F.R. § 404.1525.

primarily on Jones's noncompliance with prescribed treatment, which prevented him from satisfying the listing's frequency requirement. *See* Tr. 19.

In the neurological section of the listings, the Social Security Administration defines epilepsy as "a pattern of recurrent and unprovoked seizures that are manifestations of abnormal electrical activity in the brain." 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.00H.[24] Listing 11.00H states that "[t]here are various types of generalized and 'focal' or partial seizures," of which generalized tonic-clonic seizures are one type. *Id.* § 11.00H(1)(a). A claimant may, in pertinent part, satisfy Listing 11.02A with evidence of documented epilepsy that is characterized by "[g]eneralized tonic-clonic seizures, occurring at least once a month for at least [three] consecutive months despite [the claimant's adherence] to prescribed treatment." 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.02. The listings define *despite adherence to prescribed treatment* as meaning that for at least three consecutive months, the claimant took medication as directed—or followed other treatment procedures as prescribed by a physician—and yet his epilepsy continued to meet the listing's "requirements despite [the] treatment." *See* 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.00C.

In 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.00H(4), the Social Security Administration defines epilepsy and explains how it evaluates

---

[24]     *Disability Evaluation Under Social Security, 11.00 Neurological - Adult*          https://www.ssa.gov/disability/professionals/bluebook/11.00-Neurological-Adult.htm#11_02 [https://perma.cc/U6BE-BJPM].

epilepsy under Listing 11.02. It also explains that the Commissioner and his agents will consider adherence to prescribed treatment during the relevant time period in calculating the number of qualifying seizures for the listing's frequency requirement. 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.00H(4). The agency does not count seizures occurring during a period of noncompliance unless the claimant has established good cause for the noncompliance. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.00H(4)(d). The agency explains that "[w]hen it determines that [a claimant] had good reason for not adhering to prescribed treatment, [it] will consider [the claimant's] physical, mental, educational, and communicative limitations (including any language barriers)." *Id*. "[I]f, for example, the treatment [were] very risky … due to its consequences or unusual nature," the agency would consider that "good reason" for the claimant's non-adherence to such treatment. *Id*.

The agency states in Listing 11.00H(4)(d) that it follows the guidelines established in 20 C.F.R. §§ 404.1530(c) and 416.930(c) when considering why a claimant did not adhere to his or her prescribed treatment. The following are the regulations' examples of good cause:

> (1) The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion.
>
> (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.

32

(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.

(4) The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5) The treatment involves amputation of an extremity, or a major part of an extremity.

20 C.F.R. §§ 404.1530(c), 416.930(c).

> a. *Whether substantial evidence supported the ALJ's step three finding*

Jones says that he had "tonic-clonic (grand mal) seizures occurring at least once a month for at least 3 months during periods of compliance [and that] [t]he ALJ failed to evaluate this evidence or consider whether there was good cause for failing to comply with treatment when there was noncompliance." Doc. 9, at 17.  Jones acknowledges that the ALJ identified periods with documented evidence of missed doses of medication in May, September, and October 2019, and June and August 21, 2021. Doc. 9 at 17 (citing Tr. 19, in turn citing Tr. 716, 788, 963, 1226, 2989, 3225, 3243, 3250). He claims, "[h]owever," that "there is evidence of adherence to treatment during the remaining time frames, and this evidence was not evaluated at step 3." *Id.*

In general, the claimant bears the burden of establishing that a condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x

725, 727–28 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing'" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id.* There is no heightened articulation standard at step three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Notably, the only citations to the record that Jones lists in his argument are his own self-reported statements professing adherence to treatment, *see* Doc. 9, at 18 (citing Tr. 2156–62, 2163–2253, 2316–64, 2365–2465, 2466–2550, 2551–88, 2522, 2644–82, 2683–2744), or provider references to "breakthrough" seizures without establishing what any provider meant by this reference, *see id* (citing Tr. 2375, 2558, 2745–52, 2747, 2748, 2522, 2685). Jones does not provide factual evidence or legal authority to support his assertion that "evidence of [his] adherence to treatment during the remaining time frames … was not evaluated at step [three]." Doc. 9, at 17. Crucially, Jones hasn't provided support for the assumption at the heart

of his argument—that, essentially, any period of time without documented evidence of a claimant's medication *noncompliance* must be considered affirmative evidence of the claimant's medication *compliance*. *See* Doc. 9, at 17–19. Jones has no basis for the assertion that he was having seizures despite adhering to his prescribed treatment—except his own statements, which are contradicted by the evidence. *Id*; *see also, e.g.*, Tr. 631, 716, 792–93, 788, 963, 1018, 1226, 2989, 3112, 3130, 3137.

Substantial evidence thus supports the ALJ's finding. As noted in the factual background, above, the record is replete with evidence of noncompliance, much of which the ALJ cited in his decision. Tr. 22–23 (citing Tr. 716, 788, 963, 1226, 2989, 3112, 3130, 3137). He noted that Jones's symptoms were "generally brought under control once medications were administered in a controlled setting (e.g. the emergency room). Tr. 23 (citing Tr. 793, 3137). The ALJ noted that Jones had "left the emergency room against medical advice on multiple occasions. *Id*. (citing Tr. 631, 792, 1018).

The ALJ cited specific instances of noncompliance in the record including Jones's September 2019 statement to neurologist Dr. Woodruff that he was only taking his morning dose of Lamictal. Tr. 19 (citing Tr. 1226). The ALJ noted that during a seizure-related hospitalization in October 2019, Jones reported that he "may have missed a few doses" of his Lamictal. *Id* (citing Tr. 788). Jones was supposed to take 100 milligrams of Lamictal in the

morning and 300 milligrams at night, but admitted in September 2019 that he "frequently misse[d] the evening doses." *See* Tr. 788.

The ALJ also discussed additional instances of suspected noncompliance, including Jones's hospitalization in October 2019. *See* Tr. 19 (citing Tr. 788). The ALJ noted that this began when Jones had a seizure at home and went to Mansfield Hospital for emergency medical treatment, where he had a second seizure while waiting to be admitted. *See* Tr. 19 (citing Tr. 788, 93). Jones reported that he might have missed a few doses of Lamictal, refused an EEG and having stayed less than 24 hours, left against medical advice. *See* Tr. 19, 788, 793. In June 2021, Jones said that he wasn't sure whether he had been taking his medications. Tr. 19 (citing Tr. 2989). There were many instances in which his Lamictal levels were lower than would be expected if Jones were completely compliant with his medication. Tr. 19; *see also* Tr. 634, 646, 968, 1302, 2379, 2558, 3225, 3243. And Jones's treatment providers—the professionals in the best position to opine on the issue—concluded that his seizures were likely due to medication non-adherence. *See* Tr. 19, 2989, 3114, 1302, 3243. In August 2021, Jones was hospitalized due to a seizure and had a seizure at the hospital. *See* Tr. 19, 3242–43, 3248. Lab results again revealed a low Lamictal level. Tr. 19 (citing Tr. 3225, 3243, 3250). Through these and other examples, the ALJ supported his findings regarding noncompliance in several ways and with adequate citation to the record. *See* Tr. 22–23. And because the record supports the

ALJ's noncompliance finding, Jones cannot show that he met the listing requirement for epilepsy. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.00C. ("we require that limitations from these neurological disorders exist despite adherence to prescribed treatment").

Jones acknowledges the evidence of his noncompliance but argues that it shows he wasn't adherent to his treatment in May 2019, September 2019, October 2019, June 2021, and "August 21, 2021." *See* Doc. 9, at 17 (citing Tr. 19). He claims that he is entitled to remand because ALJ Keller did not evaluate "evidence of adherence to treatment during the remaining time frames." *See id.* at 17. Jones then says that his seizures between May 28, 2019, and September 3, 2019, occurred despite adherence to treatment. Doc. 9, at 18. But there is no evidence affirmatively establishing this in the record, which, as noted, is replete with evidence to the contrary. *See, e.g.*, Tr.  968, 1302, 1335, 1348, 2284 (showing treatment providers who were suspicious of Jones's claims of compliance, lower Lamictal levels than would be expected if Jones had been completely compliant, and unremarkable study results).

Even if Jones's flawed premise—that any days without documented evidence of noncompliance in the record affirmatively show that he was compliant—were valid, remand still would not be warranted. As discussed, whether substantial evidence exists to support a different interpretation of the evidence is irrelevant because substantial evidence also supports the view of noncompliance adopted by the ALJ. *See* Tr. 23–24, 728–29. And "[s]o long

37

as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Whether substantial evidence supports the conclusion that Jones might have compliant is irrelevant unless he shows that substantial evidence does not support the ALJ's determination that he wasn't, which Jones failed to do.

     *b. Whether the ALJ had an obligation, under the Appeals Council's order or in general, to further develop the record with medical opinion evidence and failed to meet that obligation*

In its remand order, the Appeals Council said that ALJ Leland's recitation of the evidence had been only a general summary and that it didn't sufficiently support the decision's findings. Tr. 120. The Appeals Council said that ALJ Leland failed to connect specific evidence to specific RFC findings. Tr. 120. The Appeals Council took particular issue with ALJ Leland's "significant" off-task and absenteeism limitations and RFC assessment that Jones would be off-task 20 percent per day or absent from work two days per month. Tr. 119–20. The Appeals Council found that ALJ Leland did not support his conclusions with citations to the record and that he failed to properly explain his rationale. *Id*.

In determining that substantial evidence did not support ALJ Leland's RFC findings, the Appeals Council cited ALJ Leland's assessment of Jones's seizure activity. *See id*. It noted that ALJ Leland crafted an RFC based, in part, on the premise that Jones's—primarily nocturnal—seizure activity

increased after June 2019 despite Jones's adherence to medication. Tr. 119 (citing Tr. 545, 615, 634–35, 722, 780, 1297, 1307, 1323, 1352). The Appeals Council credited the increased frequency of Jones's medical treatment for seizures, Tr. 120 (citing Tr. 112), but pointed out that with treatment, Jones generally had normal examinations with "few abnormalities except occasional episodes of high blood pressure or headaches," *id*.

For example, the Appeals Council discussed Jones's hospitalization in late June 2019. *Id* (citing Tr. 633). Jones was sleeping when he experienced seizure activity for which he needed emergency care. *See* Tr. 120, 634. He was admitted at Mansfield Hospital but left against medical advice once his seizure symptoms resolved. *See* Tr. 120, 634–35. Jones experienced two seizures at home and returned to the hospital. *See* Tr. 120, 642. The Appeals Council noted that Jones was alert, oriented, and in no apparent distress. Tr. 120 (citing Tr. 634). He had a normal heart rate and rhythm and normal movement in all extremities. *Id* (citing Tr. 634). His neurological system was "grossly normal without focal findings." *Id* (citing Tr. 634).

In this manner, the Appeals Council reviewed Jones's emergency room records for visits throughout the rest of 2019 and 2020 and noted normal exam findings each time. *See* Tr. 120. The Appeals Council noted Jones's normal EEG findings in March 2020. Tr. 121. The Appeals Council noted many instances throughout 2019 and 2020 in which Jones was treated at the emergency room for seizures and his condition stabilized once he received

seizure medication. *Id* (citing Tr. 1918–2744). Based on these and other examples, the Appeals Council concluded that neither ALJ Leland's decision nor the record supported RFC findings of two absences per month and 20 percent of each day off task. Tr. 119, 120. Accordingly, the Appeals Council remanded the case for additional consideration. Tr. 120.

*Jurisdiction*. Jones contends that he is entitled to remand because the ALJ failed to comply with the Appeals Council's order of remand. Doc. 9, at 19–20. Jones argues that the ALJ violated the remand order in relation to the medical opinion evidence of Jones's neurological disorder. Doc. 9, at 19.

The Commissioner argues that the Court does not have jurisdiction to examine the ALJ's compliance with the Appeals Council's order of remand because the order concerns "an internal agency matter," which arose "prior to the issuance" of the ALJ's final decision. Doc. 12, at 17–18 (citing *Staten v. Comm'r of Soc. Sec.*, No. 1:22-cv-260, 2022 WL 18863825, at *9 (N.D. Ohio Dec. 14, 2022) (quoting *Brown v. Comm'r of Soc. Sec.*, No. 1:08-cv-183, 2009 WL 465708, at *6 (W.D. Mich. Feb. 24, 2009), *report and recommendation adopted*, 2023 WL 2568006 (N.D. Ohio Mar. 20, 2023). The Commissioner urges this Court to follow the reasoning in *Staten*. Doc. 12, at 18. He implies that the Appeals Council's acceptance of the ALJ's second decision, *see* Tr. 1–6, should be understood as acknowledgement that the Appeals Council's remand order was satisfied, *see* Doc. 12, at 18. In his reply brief, Jones ignores the jurisdictional issue raised by the Commissioner and does not

contest the Commissioner's assertion that the Appeals Council's decision not to grant Jones's second request for appeal implies that the ALJ complied with the remand order.

Despite Jones's disregard of the issue, this Court must consider whether it can evaluate the ALJ's compliance with the Appeals Council's remand order. As the Commissioner notes, there is no consensus regarding whether an ALJ's failure to adhere to an Appeals Council's remand order constitutes an independent ground for reversal. *Compare Brown*, 2009 WL 465708, at *6 (holding that that the court lacked jurisdiction to evaluate whether an ALJ complied with the Appeals Council's remand order), *Blajei v. Comm'r of Soc. Sec.*, No. 11-cv-13269, 2012 WL 3020026, at *8 (E.D. Mich. June 18, 2012), *with Kaddo v. Comm'r of Soc. Sec.*, 238 F.Supp.3d 939, 943–45 (E.D. Mich. Feb. 28, 2017). And the Sixth Circuit has not addressed the issue. *See Gritzinger*, 2021 WL 3672230, at *10 n.1.

Most courts in this Circuit, however, have found that federal courts lack jurisdiction to consider the issue. *See Hubbard v. Comm'r of Soc. Sec.*, No. 18-cv-11758, 2019 WL 4866733, at *3 (E.D. Mich. June 10, 2019), *report and recommendation adopted*, 2019 WL 4593624 (E.D. Mich. Sept. 23, 2019), *Smith v. Comm'r of Soc. Sec.*, No. 2:17-cv-13367, 2018 WL 7364646, at *10 (E.D. Mich. Oct. 26, 2018), *report and recommendation adopted*, 2019 WL 700096 (E.D. Mich. Feb. 20, 2019), *Sisson v. Colvin*, No. 5:15-cv-552, 2016 WL 8671906, at *12 (N.D. Ohio June 14, 2016), *report and recommendation*

*adopted*, 2016 WL 3360509 (N.D. Ohio June 14, 2016). I agree with the majority.

Under 42 U.S.C. §405(g), a claimant may appeal "the final decision of the Commissioner of Social Security." As the Supreme Court observed in *Smith v. Berryhill*, "the phrase 'final decision' clearly denotes some kind of terminal event." 139 S. Ct. 1765, 1774 (2019). As one court has explained, if the Appeals Council denies review, the ALJ's decision is the final decision of the Commissioner. *Shope v. Comm'r of Soc. Sec.*, 2015 WL 3823165 at *9 (S.D. Ohio June 19, 2015), *report and recommendation adopted*, 2015 WL 6155919 (S.D. Ohio Oct. 20, 2015). And when a court reviews the final decision of the Commissioner, it's review "is confined to" the ALJ's decision and "the evidence presented" before the ALJ. *Id* (relying on *Jones*, 336 F.3d at 477). "'Whether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises prior to the issuance of the agency's final decision.'" *Id.* (quoting Brown, 2009 WL 465708, at *6).

As noted, Jones does not contest the Commissioner's jurisdictional argument. He does however cite *Wilson v. Comm'r of Soc. Sec.*, in which the Sixth Circuit explained that an ALJ is required to comply with an Appeals Council's remand order. 783 F.App'x. 489, 496-497 (6th Cir. 2019). The Court, however, did not analyze the threshold jurisdictional issue the Commissioner raises here. *See Gritzinger*, 2021 WL 3672230, at *10 n.1. And "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal

decision, the decision does not stand for the proposition that no defect existed." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011). So *Wilson* does not support finding that this Court has the authority to review whether the ALJ complied with the Appeals Council's remand order.

*Merits*. Even setting the jurisdictional issue aside, as discussed below, Jones's claim fails on the merits. Jones says that ALJ Keller improperly denied his attorney's requests that the agency obtain a consultative examination and expert opinion evidence specific to Jones's physical impairments. *See id* (citing Tr. 15, 39–40, 402). He first says that the ALJ had a heightened duty to develop the record and "should have requested an opinion from a treating medical source, obtained a consultative examination, or obtained a medical expert to review the complete medical history." Doc. 9, at 20. He then argues in the alternative that "even if the facts of the instant case did not require … a heightened duty to develop the record," the ALJ did not meet his obligation to ensure that a reasonable record was developed. *See* Doc. 9, at 21. Jones says that the record needed "an opinion from a treating source or examining source regarding Plaintiff's physical impairments" and claims that none of the state agency doctors made findings as to whether Jones's impairments met or medically equaled any listing. *Id.* at 21. He claims that the record was insufficient without a consultative physical

examination "prior to after the prior ALJ's decision."[25] *Id* at 21. He says—again—that the ALJ's rejection of his requests for such a consultative physical examination or medical expert were "in contra[di]ction to the remand order." *Id* at 21. To the extent that Jones claims the record was insufficient *in general* and that this insufficiency obligated the ALJ to obtain additional expert opinion or consultative examination evidence, he is incorrect.

While an ALJ must ensure that every claimant receives a "full and fair hearing," the ultimate burden of proving entitlement to benefits lies with the claimant. *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); 20 C.F.R. § 404.1512(a)). Although social security proceedings are inquisitorial rather than adversarial, that doesn't mean that the ALJ advocates for the claimant. *See Moats*, 42 F.4th at 563 ("Promoting the claimant's case, of course, is not the ALJ's obligation. The ALJ, remember, is a neutral factfinder, not an advocate.") (citing *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (plurality opinion)).

It is only under "extreme circumstances"—not present here—that the ALJ could be said to have a "special duty" to help develop the record. *See*

---

[25] It's not clear what Jones means by "prior to after the prior ALJ's decision." Doc. 9, at 21. For the purposes of this decision, I interpret this as a reference to the nine months after ALJ Leland issued his decision and before ALJ Keller issued his decision. Doc. 9, at 20. So Jones is claiming the record was insufficient because it didn't contain consultative physical exam findings generated between February and November 2021. *See id*; Tr. 28; Tr. 116.

*Moats*, 42 F.4th at 563–64 (discussing *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir. 1983)). Jones, however, ignores *Moats* and its relegation of *Lashley* to "extreme" situations, cites several cases that rely on *Lashley*, and argues that the ALJ erred by not developing the record. Doc. 9, at 14–18; Doc. 12, at 7–9. To the extent that Jones argues that the ALJ erred under *Lashley* and its progeny, his argument fails. Jones hasn't shown that his case was an "extreme" situation in which the ALJ had a heightened duty to develop the record. *See Moats*, 42 F.4th at 564 (distinguishing *Lashley* and declining to impose a duty-to-develop-the-record-obligation even though the claimant was unrepresented).

The problem for Jones is that the rule on which his develop-the-record argument relies does not enjoy the support of binding legal precedent. Jones's claim seems to stem from *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008). *See* Doc. 9, at 20 (citing a report and recommendation relying on *Deskin*). In *Deskin*, the court held that:

> As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

605 F. Supp. 2d at 912 (quoting *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)). But *Deskin* isn't controlling, and it has received mixed reviews. *See Winans v. Comm'r of Soc. Sec.*, No. 5:22-CV-01793, 2023 WL 7622634, at *4 (N.D. Ohio Nov. 15, 2023) ("*Deskin* … conflicts with the regulations and Sixth Circuit case law"); *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) ("The Court finds, however, that *Deskin* … is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals."); *see also Berrier v. Comm'r of Soc. Sec.*, No. 3:20-cv-1655, 2021 WL 6881246, at *6 (N.D. Ohio Sept. 10, 2021) (citing cases that followed *Deskin* and those that did not), *report and recommendation adopted*, 2022 WL 189855 (N.D. Ohio Jan. 21, 2022). Indeed, "[a]fter some criticism from other district courts in the Sixth Circuit, the *Deskin* court [in *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866, at *1 (N.D. Ohio Oct. 21, 2011)] clarified its decision" to hold "that *Deskin potentially* applies in only two circumstances." *Berrier*, 2021 WL 6881246, at *6 (emphasis added); *Kizys*, 2011 WL 5024866, at *2 ("Properly understood, *Deskin* sets out a narrow rule that does not constitute a bright-line test" and "*potentially* applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence") (emphasis added).

46

The bottom line is that various courts apply various standards from largely unpublished district court opinions. I return to the language of the regulations and Sixth Circuit authority, which make clear that the burden to prove his case rests on the claimant, not the ALJ. *See Moats*, 42 F.4th at 563; 20 C.F.R. § 404.1512(a). Further, "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so *if the existing medical sources do not contain sufficient evidence to make a determination.*" *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (emphasis added) (citing 20 C.F.R. § 416.917(a)); *see Winans*, 2023 WL 7622634, at *3–4 nn. 39–40, 42–43, 50 (citing *Landsaw*). While the ALJ has a duty to conduct a "full inquiry," that duty "does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." *Landsaw*, 803 F.2d at 214 (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)); *see also* 20 C.F.R. § 416.919a(b)(1) (an ALJ may be required to obtain a consultative exam when "[t]he additional evidence needed is not contained in the records of [the claimant's] medical sources").

Jones hasn't shown why the record was insufficient for the ALJ to make a disability determination without additional medical opinion evidence regarding his physical impairment allegations. *See Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) ("An ALJ has discretion to determine whether

further evidence, such as additional testing or expert testimony, is necessary."); *see also Owens v. Berryhill*, No. 1:18-cv-1043, 2019 WL 2465229, at *13 (N.D. Ohio Feb. 13, 2019), *report and recommendation adopted*, 2019 WL 1929695 (N.D. Ohio Apr. 30, 2019) ("Owens has offered no information concerning what evidence further record development could offer that would have enhanced a determination of disability").

Here, none of the medical professionals who assessed Jones's physical health found that he had any physical impairment that prevented him from performing any labor. *See, e.g.*, Tr. 88–89, 93, 102, 104. While the medical professionals and ALJ Keller agreed that Jones required additional limitations—he was to avoid exposure to environmental hazards and never climb ropes, scaffolds, or ladders—no one found that these limitations were work-preclusive at *any* level of exertion. *See* Tr. 88–89, 101, 102, 104, 111. Even ALJ Leland in the initial RFC found that Jones had the physical capacity to perform work at all exertional levels with the same additional limitations. *See* Tr. 111. And contrary to Jones's claims, both of the state agency physicians indicated that they had considered the requirements of Listing 11.02 for epilepsy when considering Jones's evidence, crafting their RFCs, and formulating their medical opinions. *See* Tr. 87, 100. So there was ample support for ALJ Keller's finding that the consultative and expert opinion evidence already in the record was a sufficient basis for him to

determine Jones's vocationally relevant physical abilities and limitations. *See* Tr. 15.

Jones argues that the record demanded additional analysis because he generated additional treatment notes related to seizures that occurred after the state agency physicians rendered their opinions. *See* Doc. 9, at 21. But the ALJ explained how the opinions of state agency physicians Dr. Lewis and Dr. Hughes were nonetheless adequately supported by the record. *See* Tr. 23. And the ALJ's decision specifically and repeatedly referenced Jones's treatment for seizures after Dr. Hughes's April 2020 opinion. *See, e.g*, Tr. 22 (citing episodes of confusion for two weeks in November 2020 and emergency room visits on November 16, 2020; March 3, 2021; June 15, 2021; and August 21, 2021); *see also* Tr. 23 (noting noncompliance in June and August 2021 and comparing statements about alcohol use from November 2019 that Jones contradicted in November 2020 and March 2021). As such, the ALJ showed that the state agency physician's opinions were "supported by the totality of evidence in the record and [that he had] considered the evidence obtained after [the state agency doctors] issued [their] opinion[s]." *Myland v. Comm'r of Soc. Sec.,* No. 17-1592, 2017 WL 5632842, at *2 (6th Cir. Nov. 13, 2017) (citing *McGrew v. Comm'r of Soc. Sec.*, 343 F.App'x. 26, 32 (6th Cir. 2009).

ALJ Keller thus did not err when he determined additional medical expert opinion evidence about Jones's physical health wasn't required for the ALJ to evaluate neurological impairments under Listing 11.02. *See* Tr. 15.

49

And the record was not insufficient. The ALJ permissibly relied on the state agency doctors's opinions in finding that Jones did not meet or medically equal Listing 11.02 or any other listing. *See* Tr. 19. Jones may disagree with the ALJ's determination but disagreement does not "provide a basis for remand." *Steed v. Colvin*, No. 4:15-cv-1269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016).

### c. *Whether the ALJ properly considered Jones's mental and cognitive impairments when considering noncompliance with treatment*

Jones says that the ALJ failed to properly consider whether Jones had "reasonable justifications for missing medication doses" when he considered Listing 11.02A. Doc. 9, at 22. Jones says that the ALJ was obligated under Social Security Ruling (SSR) 16-3p to consider possible reasons for his "failure to seek medical treatment consistent with his alleged degree of impairment before drawing an adverse inference" from that "lack of medical treatment."[26] *Id*; *see* Social Security Ruling 16-3p: Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029 (Mar. 16, 2016). But SSR 16-3p isn't relevant here. SSR 16-3p instructs adjudicators about how to evaluate the "intensity, persistence, and functionally limiting effects of symptoms" and whether a claimant's alleged impairments could "reasonably be expected to produce those symptoms." *See* 2016 WL 1119029,

---

[26]     Jones also cites "SSR 18-3p" but does not explain how or why it applies or what it might require. Doc. 9, at 22. So he has forfeited any argument based on that ruling. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

at *2. It clarifies, generally, how an adjudicator ought to consider various types of evidence when evaluating a claimant's subjective statements. *See id.* SSR 16-3p does not, on its face, apply here, where the issue is an ALJ's evaluation of a claimant's noncompliance with prescribed treatment and where there is no dispute about the extent to which the claimant sought medical treatment. And Jones hasn't provided any explanation or legal authority showing that SSR 16-3p does apply. So, SSR 16-3p isn't relevant.

As discussed within Jones's first claim, the agency's rules for counting seizures under the listing do apply and are relevant. And, also as discussed, the ALJ adequately supported his findings under the listing with substantial evidence of Jones's noncompliance. *See* Tr. 22–23. Jones says that the ALJ was obligated to consider whether Jones had good cause for his noncompliance. Doc. 9, at 22. He claims that the ALJ should have considered the potential effect that Jones's memory issues and cognitive impairments might have had on the ability to comply with treatment. *Id.*

But Jones hasn't provided anything demonstrating that his memory or cognitive issues affected his compliance. He seems to suggest that cognitive issues might have affected his compliance, but concedes that his providers presumed that his seizures did not result from cognitive decline. *See* Doc. 9, at 22–23 (citing Tr. 3113–14). In fact, the objective medical evidence contains multiple statements contrary to Jones's argument. *See, e.g.*, Tr. 646, 972 (reciting Jones's statements that he did not take his Lamictal because he

vomited and felt nauseated throughout the day and because he was busy helping his son); *see also, e.g.,* Tr. 716, 717–18, 788, 963, 1226, 2699, 2989, 3114, 3225, 3243, 3250.

Even assuming that Jones could produce some evidence to establish a causal connection between his memory or cognition and his noncompliance, he hasn't cited any legal authority demonstrating that these excuses qualify as acceptable good cause under the agency's guidelines.  Notably, the reasons Jones reported for not taking his seizure medication—because he felt unwell or left his medicine at home or was busy, *see, e.g.*, Tr. 646, 972, 2699—were not nearly as severe as those in the agency's list of "good reason[s] for not following treatment." *See* 20 C.F.R. Pt. 404, Subpart 1, App. 1 § 11.00H.4.d, 20 C.F.R. §§ 404.1530(c), 416.930(c). So even if Jones could show some sort of connection between his memory or cognition and his noncompliance, he provides no authority showing that his excuses could be material. Simply because memory issues are present in the record does not excuse Jones's noncompliance with prescribed treatment for the purposes of Listing 11.02. *See Kyle v. Berryhill,* No. 5:18-cv-63, 2019 WL 3325812, at *2 (W.D. Ky. July 24, 2019) (finding that Listing 11.02 did not excuse a claimant's noncompliance with prescribed treatment simply because memory issues

52

were present in the record). As the Commissioner says, the Court's determination in *Kyle* similarly applies here. *See* Doc. 12, at 12.[27]

Moreover, as noted, the claimant bears the burden of establishing that his condition meets or equals a listing. *Thacker*, 93 F. App'x at 727–28 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). The ALJ cited substantial evidence in the record to establish Jones's noncompliance, *see* Tr. 22–23, and Jones hasn't provided any facts or legal authority to justify the suggestion that his noncompliance was rooted in good cause. The assertions Jones makes aren't supported by caselaw or the record. So he hasn't met his burden show that he met or equaled Listing 11.02. *See* Doc. 9, at 22–23.

And, while it's true that the ALJ didn't specifically mention Jones's mental impairments when discussing noncompliance, as the Commissioner points out, at step three, an ALJ isn't under a heightened duty to explain each consideration that went into each determination. *See* Doc. 12, at 12 (citing *Bledsoe*, 165 F. App'x at 411). It isn't reversible error for an ALJ not to consider memory issues as to noncompliance, particularly where the claimant does not have any evidence showing that memory issues caused the noncompliance. Jones isn't entitled to remand on this basis.

---

[27] Jones's attempts to distinguish his case from *Kyle* are unpersuasive, as his protests do not address the cited aspect of the *Kyle* holding. *See* Doc. 14, at 4–5.

2. *Challenging the ALJ's RFC*

a. *Whether the ALJ was able to determine the most that Jones could do despite impairments due to Jones's neurological disorder*

In his second issue, Jones asserts that the ALJ's RFC is not supported by substantial evidence. Doc. 9, at 23. Jones first implies error—without directly explaining the error—when he asserts that the record did not contain a medical opinion that sufficiently addressed his neurological disorder and that ALJ Keller "was not qualified to determine [Jones's] functioning in the absence of [such] a medical opinion." *See* Doc. 9, at 24. Without citing any fact or evidence in support, Jones says that these errors "harmed" him apparently because of ALJ Leland's overturned determination that Jones was "disabled primarily with the limitation that" Jones would be off-task 20 percent of each workday and absent twice a month. *See id.*

The most immediate problem with Jones's apparent argument is that the ALJ can formulate an RFC without a medical opinion. *See Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding"); *see also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018); *Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015) (affirming that "neither the applicable regulations nor Sixth Circuit law limit the ALJ to consideration of direct medical opinions on the issue of RFC" and, moreover "none of the[] cases [cited by the claimant] even remotely suggests that an ALJ must, as a

matter of law, seek out a physician's medical opinion where one is not offered."); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the plaintiff's argument that the ALJ is required "to base her RFC finding on a physician's opinion").

Further, Jones cites *Falkosky*, in which this Court found a lack of support for an ALJ's RFC on the grounds that additional consultative opinion evidence was necessary. *See* Doc. 9, at 24 (citing *Falkosky v. Comm'r of Soc. Sec.*, No. 1:19-cv-2632, 2020 WL 5423967, at *8 (N.D. Ohio Sept. 10, 2020)). The Court held that since the record was rather limited, the ALJ must have extrapolated facts in crafting an RFC that determined Falkosky was able to perform labor at a medium level of exertion. No doubt, an ALJ who extrapolates facts from a sparse record *could* develop an RFC that wasn't supported by substantial evidence. And it's true that an ALJ in that position *might* decide to order an evaluation of the claimant by a consultative medical professional. But *Falkosky* hinges on facts which are distinguishable from the circumstances here. In *Falkosky*, the Court held that another medical opinion might not have been necessary if the ALJ were able to support the RFC findings with "medical records demonstrating Falkosky's functional abilities" such as, for example, findings that Falkosky was capable of meeting the exertional requirements of work at a medium level. *See* 2020 WL 5423967, at *8.

Here, in contrast, ALJ Keller had over 3,500 pages of evidence, comprised primarily of objective medical records, assessments, and opinions based on examinations, reports, and treatment for Jones's neurological issues, seizure activity, and injuries resulting therefrom. *See* Tr. 40–42, 44, 49–50, 59–60, 62, 65–72, 79–95, 96–106, 117–24, 125–27, 183–87, 235–41, 287–89, 298–307, 325–35, 336–44, 356–561, 373–78, 384–89, 410–32, 433–80, 491–534, 541–947, 948–1225, 1226–39, 1240–85, 1288–95, 1296–1372, 1390–1802, 1803–42, 1843, 1844–49, 1866–88, 1889–1917, 1918–2744, 2745–57, 2763–69, 2770–2813, 2814–28, 2829–3501.[28] And the ALJ cited evidence in support of his determination. So *Falkosky* doesn't support Jones argument.[29]

---

[28]    In his reply brief, Jones claims that because the Commissioner indicated that the record "contained over 3,500 pages of evidence" and that "3,000 [of those pages] were medical records," over 1,650 pages of medical evidence were not reviewed by the state agency consultant physicians Doc. 14, at 7. But Jones does not cite any evidence showing that the 1,650 pages of the record were not reviewed. To the contrary, as discussed, in his decision, ALJ Keller referenced evidence generated and submitted after Dr. Hughes's reconsidered opinion was rendered. *See* Tr 22–23. Moreover, Jones has forfeited this issue by waiting until his reply brief to raise it. *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006).

[29]    Jones cites ALJ Leland's findings to support this argument, Doc. 9, at 24, however, the Appeals Council already found that ALJ Leland's findings were invalid due to the lack of evidentiary support in the record. Moreover, ALJ Leland's findings aren't factual evidence demonstrating how or why Jones would be expected to miss two or more days per month or be off task for 20 percent of the workday.

56

  b. *Whether the ALJ properly evaluated Dr. Dubey's medical opinion
  evidence and accounted for Dr. Dubey's opinions in the RFC*

Jones next says that the ALJ erred in his evaluation of Dr. Dubey's

consultative psychological examination. Jones says that the ALJ erred when

he credited only a portion of the opinion and that this cited portion was

inconsistent with the ALJ's RFC findings. *See* Doc. 9, at 24 (citing Tr. 26,

1288–95). According to Jones, Dr. Dubey "articulated specific limitations that

were not reflected in the RFC finding." *Id.* Jones refers to one limitation in

specific, that "[in] a work setting, based on the available information, he

would be able to understand, remember and carry out simple instructions

independently, such as <u>one-step processes</u>." Doc. 9, at 24 (underlined in

original) (quoting Tr. 1293); *see also* Tr. 24–26. Jones says that the ALJ erred

when he did not limit Jones to one-step processes and failed to explain his

exclusion of this limitation from the RFC. *See* Doc. 9, at 24. This argument

fails for several reasons.

First, the ALJ demonstrated full consideration of Dr. Dubey's opinion.

After reviewing it at great length, the ALJ found that the opinion was

generally persuasive based on the factors of supportability and consistency.

*See* 20 C.F.R. §§ 416.920c(a), 416.920c(b)(2), (c)(1)-(5), *Toennies v. Comm'r of

Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020). Despite finding

Dr. Dubey's opinion generally persuasive and relying on it throughout his

analysis, as explained below, ALJ Keller did not err when he did not fully

incorporate all of Dr. Dubey's opined limitations in the RFC. *Compare* Tr. 21 *with* Tr. 1292–94; *see also* Tr. 25–26.

The ALJ's citations to objective medical records provide adequate evidence of the supportability and consistency of Dr. Dubey's findings as compared to the rest of the record. These citations included treatment records finding normal cognition, memory, alertness, attention span, and concentration with normal recent and remote memory. Tr. 1128, 1311. They included findings that Jones was alert and attentive, oriented to person, place, time, and the reason for his admission to the hospital, that he was using fluent language with intact repetition and comprehension, and that he demonstrated immediate recall and working memory as well as an intact long-term memory. Tr. 3233, 3241.

The ALJ also heavily relied on Dr. Dubey's opinions throughout his discussion of his rationale for the RFC, beyond just the quoted portion Jones cites, which the ALJ excerpted at the end of his explanation for the RFC. *See* Tr. 21, 24–26. For example, as the ALJ considered Jones's mental impairment evidence, he cited Dr. Dubey's notes reciting Jones's alleged symptoms of "anxious mood, depressed mood, trouble sleeping, loss of interest in activities, nightmares, flashbacks, social isolation, irritability, suicidal ideation, crying spells, appetite loss, sleep disturbance, and racing thoughts." Tr. 24 (citing Tr. 510, 1289, 1333, 2860, 3237). The ALJ noted that Jones reported significant past trauma to Dr. Dubey. *Id* (citing Tr. 1289). After

further discussing Jones's mental health treatment, the ALJ again cited Dr. Dubey's report, as well as hospital records, in finding that there was no evidence of hospitalization on a psychiatric basis in the record. *Id* (citing 1289, 3237).

The ALJ cited additional aspects of Dr. Dubey's report in support of the finding that Jones's symptoms were not as severe as Jones alleged. *See* Tr. 24. For example, in finding that Jones had the RFC to perform simple, repetitive tasks, the ALJ acknowledged Jones's assertions of poor memory and difficulty understanding and following instructions. *See id*. The ALJ then considered contradictory evidence of normal comprehension, cognition, and intelligence as found by Dr. Woodruff, as well as the emergency department staff at Riverside Methodist Hospital and Mansfield. *See* Tr. 24 (citing Tr. 1228, 1311, 3233, 3241). The ALJ noted Dr. Dubey's opinions that Jones:

> did not need simple directions or questions repeated. He did not need multi-step directions or questions repeated. He appeared to understand the questions he was asked. He was able to complete five digits forward and three digits backward. His performance on serial sevens was limited, and delayed recall of three items was 0/3. Overall, the level of cognitive functioning was estimated to be in the low average range. Additional explanations of words or phrases did not need to be given. Observed recall of recent events and past experiences was unremarkable.

Tr. 24 (citing Tr. 1291–92). The ALJ determined that Jones had the RFC for "brief interactions with supervisors and coworkers sufficient to learn [an] unskilled job, adapt to changes … , and exchange appropriate work

information, but [could not have] public contact," despite Jones's claims that PTSD affected his social life. *See* Tr. 21, 24–25. The ALJ relied partially on Dr. Dubey's observation that Jones "had minimal eye contact but was calm and cooperative" to support this finding. *See* Tr. 24–25 (citing Tr. 1291).

The ALJ further cited portions of Dr. Dubey's opinions when evaluating Jones's ability to pay attention and concentrate. *See* Tr. 25. The ALJ noted Jones's claim that he could not concentrate for long, then discussed contrary notes from treatment providers who observed intact attention and concentration. *See* Tr. 25 (citing Tr. 1311, 3233, 3241). The ALJ then turned to Dr. Dubey's opinions, reciting that:

> Dr. Dubey did not observe any attention problems. He was able to complete five digits forward and three digits backward. His performance on serial sevens was limited, but math skills were in the average range. He alleged that he has difficulty completing tasks, but Dr. Dubey did not mention any problems with persistence or pace.

Tr. 25 (citing Tr. 1291–92).

The ALJ relied on Dr. Dubey's opinions in crafting the RFC as to adaptation and self-management. *See* Tr. 21, 25. The ALJ compared Jones's statements that he could not handle stress to contrary evidence from treatment providers who generally observed normal mood and affect. *See* Tr. 25 (citing Tr. 1346, 1749, 2594, 2858, 3241). Dr. Dubey's findings, among other evidence, provided a basis for the RFC finding that Jones had the ability to work in an environment with few workplace changes. *See* Tr. 21, 25.

60

The ALJ cited Dr. Dubey's observations that Jones had unremarkable hygiene and grooming, unremarkable motor activity, and arrived for his physical evaluation dressed appropriately. *Id* (citing Tr. 1291). He noted Dr. Dubey's findings that general interaction with Jones was calm, however, Jones appeared "depressed and tearful when discussing changes." *Id* (citing Tr. 1291). The ALJ also cited to Dr. Dubey's report that Jones indicated that he was able to perform daily activities such as "washing up and showering, changing clothes, shopping for personal items, and completing paperwork" independently. *Id* (citing Tr. 1292). The ALJ noted that Dr. Dubey found, in a vocational setting, that Jones would be able to "understand, remember and carry out simple instructions independently, such as one-step processes[,] … understand, remember and carry out multi-step instructions independently[,] … maintain persistence and pace to remember and carry out simple instructions independently." Tr. 25–26 (citing Tr. 1293–94).

The ALJ continued to quote Dr. Dubey's opinion, including that Jones "would not be able to maintain persistence and pace to remember and carry out multi-step instructions independently, as evidenced by cognitive issues and memory problems … [but] would be able to perform these types of tasks with supervision." Tr. 26 (citing Tr. 1293–94). The ALJ noted that Dr. Dubey found Jones would, "overall[,] … have some issues dealing with co-workers and supervisors" possibly due to "problems stemming from memory issues and mood related problems, leading to associated frustration for the

61

claimant, co-workers, and supervisors." Tr. 26 (citing Tr. 1294). He recited Dr. Dubey's finding that, "overall[,]" Jones would likely have "some issues dealing with work pressure" possibly related to "problems stemming from cognitive and memory issues, leading to associated frustration for the claimant, co-workers, and supervisors." Tr. 26 (citing Tr. 1294).

Given the above, it is clear that the ALJ fully considered Dr. Dubey's findings.

The second reason that Jones's argument fails is because the ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x. 149, 157 (6th Cir. 2009). When determining an RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding ... [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id*. And, "[e]ven where an ALJ provides 'great weight' to an opinion," there is no requirement that an ALJ adopt a consultative medical opinion verbatim or adopt its limitations wholesale. *Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x. 267, 275 (6th Cir. 2015); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, *7-8 (N.D. Ohio Dec. 4, 2013) (holding that even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion to which the ALJ assigned great weight, the ALJ's decision was neither procedurally inadequate nor

unsupported by substantial evidence). Furthermore, an ALJ is not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's medical opinion. *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, *11 (N.D. Ohio Mar. 19, 2013), *aff'd*, No. 13-3578 (6th Cir. Jan. 30, 2014).

The third reason that Jones's argument fails is because the ALJ explained why he didn't fully adopt Dr. Dubey's opinion. Jones's argument ignores much of Dr. Dubey's report, including the sentence immediately after the one Jones cites. *See, e.g.*, Tr. 21, 25–26, 1293–94. Jones also overlooks the rationale the ALJ provided explaining how he arrived at an RFC that was more restrictive than Dr. Dubey's opinions suggested. *See* Tr. 26, 1293–94.

After finding that Jones was able to handle simple instructions independently, Dr. Dubey found the same with respect to Jones's ability to handle instructions requiring multiple steps. *See* Tr. 1293. He found that "[i]n a work setting, based on the available information, [Jones] would be able to understand, remember and carry out multi-step instructions independently." *Id*. Dr. Dubey opined that Jones had an unlimited ability to understand, remember, and carry out simple and multi-step instructions. Tr. 1293. He could maintain the persistence and pace to remember and carry out simple instructions. Tr. 1293–94. According to Dr. Dubey, Jones was, however, limited in his ability to maintain persistence and pace sufficient to remember

and carry out multi-step instructions and could only perform those tasks if supervised. *See* 1293–94.

In the RFC, the ALJ limited Jones to "simple, repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions with few if any workplace changes" and "brief interactions with supervisors and coworkers." Tr. 21. He explained that these more restrictive limitations avoided the need for special supervision. *See* Tr. 21, 26. The ALJ incorporated limitations based on Dr. Dubey's opinion as to the effect Jones's cognitive abilities and memory issues would have on his ability to maintain enough persistence and pace to remember and carry out complex tasks. *See* Tr. 21, 25–26. Then, the ALJ explained why he had not adopted Dr. Dubey's less restrictive complex-tasks-with-supervision findings. *See* Doc. 9, at 24; Tr. 26. The ALJ also explained that he found Dr. Dubey's social interaction and adaptation limitations "overly vague," so he crafted the RFC to include "more specific language" in those domains. Tr. 26.

The ALJ's task-and-instruction limitations were thus more restrictive than those suggested by Dr. Dubey. *Compare* Tr. 21, 26 *with* Tr. 1293–94. Jones does not point any medical opinion in the record more restrictive as to complex and simple tasks and instructions than those in the RFC. *See* 21, 25–26, 79–94, 96–106, 1288–95. So even if the ALJ erred in analyzing Dr. Dubey's medical opinions, the error—which benefitted Jones—would be

harmless at best. *See Pistole v. Kijakazi*, No. 3:20-cv-00249, 2021 WL 5238777, at *7 (E.D. Tenn. Nov. 10, 2021) (finding "harmless error at most" where an ALJ discounted medical opinion evidence but determined an RFC that was more restrictive than the medical opinion recommended); *see also Laney v. Comm'r of Soc. Sec.*, No. 5:21-cv-1290, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) ("The Court will not fault the ALJ for finding more restrictions than the state agency reviewers opined"); *Berrier,* 2021 WL 6881246, at *9; *Ferris v. Comm'r of Soc. Sec.*, No. 5:16-cv-2459, 2017 WL 5187796, at *11 n.4 (N.D. Ohio Nov. 9, 2017).

The fourth reason that Jones's argument fails is that Jones seems to conflate the actual ability to understand, remember, and carry out instructions with the cognitive ability and memory to maintain persistence and pace in order to remember and carry out instructions. *See* Doc. 9, at 24–25. The Functional Assessment portion of Dr. Dubey's report, which Jones ignores, demonstrated this distinction. *See* Tr. 1293; Doc. 9, at 24–25. In the section addressing "[t]he claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks," Dr. Dubey discussed Jones's attention, concentration, persistence, and maintenance of pace insofar as they affected his performance of simple and multi-step tasks. Tr. 1293. He estimated that Jones had an overall intellectual level of functioning in the low average range. *Id*. He considered Jones's performance of daily activities,

skilled and unskilled job history, and self-reports that he had previously met the mental requirements of his work. *Id*. Dr. Dubey then found that Jones "would be able to maintain persistence and pace to remember and carry out simple instructions independently." Tr. 1294. He further found that Jones "would not be able to maintain persistence and pace to remember and carry out multi-step instructions independently, as evidenced by cognitive issues and memory problems." *Id*. He opined that, with supervision, Jones would be able to perform these types of tasks. *Id*. Thus the assessment of whether Jones had enough cognition and memory to maintain pace and persist in the act of carrying out simple or complex instructions is a separate question from whether Jones had the practical ability to understand, remember, and carry out such instructions. Jones's argument disregards this distinction. *See* Doc. 9, at 24.

Fifth, Jones implies that the ALJ cherry picked evidence. Doc. 9, at 24–25. But he provides no analysis, instead choosing to state what he claims is a rule before offering a conclusion. *Id*. at 24–25. By omitting any argument or analysis, Jones has forfeited his cherry-picking argument. *See Kennedy*, 87 F. App'x at 466.

But even if this argument is not forfeited, it fails. It's true that an ALJ may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See Gentry v. Comm'r*, 741 F.3d 708, 723–24 (6th Cir. 2014). But an ALJ's decision to mention certain

66

evidence in one section of his decision doesn't mean that he was cherry-picking evidence. Afterall, ALJs aren't "require[d] … to discuss every piece of evidence in the record." *Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023); *see Thacker,* 99 F. App'x at 665. Indeed, "with a[n] [over three]-thousand-page record, the ALJ cannot be expected to discuss every piece of evidence that [Jones] believes is inconsistent with the" ALJ's findings. *See Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022), *report and recommendation adopted sub nom. Byler v. Comm'r of Soc. Sec. Admin.*, No. 5:20-cv-1822, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022).

What's more, an ALJ is not required to reanalyze evidence at each step of the analysis. Throughout his decision, ALJ Keller reviewed objective medical evidence, medical opinion evidence, and testimonial evidence that was relevant to his assessment of Dr. Dubey's medical opinions. *See, e.g.*, Tr. 19, 20, 21, 22, 23, 24, 25, 26. The ALJ also explicitly discussed his findings as to those medical opinions. Tr. 25–26. So in explaining the rationale for the RFC, ALJ Keller needn't have recapped this evidentiary review. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion."); *Bledsoe*, 165 F. App'x at 411. Remembering that courts do not reweigh the evidence, it is thus

unsurprising that some courts have noted that cherry-picking-evidence arguments are "seldom successful." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) ("The District Court observed that this allegation is seldom successful because crediting it would require a court to re-weigh the evidence. It is no more availing on appeal."). This cherry-picking argument is no different.

So the ALJ adequately explained his decision and was not obligated to seek the opinion of another medical source. *See Wright v. Colvin*, No. 1:15-cv-01931, 2016 WL 5661595, at *10 (N.D. Ohio Sept. 30, 2016); *Jefferson v. Colvin*, No. 1:14-cv-01851, 2015 WL 4459928, at *6 (N.D. Ohio July 21, 2015). Jones has not demonstrated any flaw in the ALJ's logic or otherwise shown that the ALJ's conclusions were based on less than substantial evidence. Jones's RFC challenge thus fails. He is not entitled to remand on the basis that "[t]he ALJ did not limit [him] to one-step processes" and the ALJ was not obligated to explain why he did not include a limitation to simple or one-step instructions in the RFC.

**Conclusion**

For the reasons explained above, I affirm the Commissioner's decision.

Dated: January 2, 2024

/s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge